**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Mamady Kalifa Keita,<br><br>Plaintiff,<br><br>v.<br><br>Scott Huckell, Matthew Russell, Jonanthan C. Peterson, Randy Erdman, Jason Oetterer, and Kenneth Peterson, *all in their individual capacities*,<br><br>Defendants. | Case No. 24-cv-598 (JWB/EMB)<br><br>**REPORT AND RECOMMENDATION** |

---

Plaintiff Mamady Kalifa Keita, proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. (Dkt. No. 1.) He claims defendants violated his constitutional rights while he was incarcerated at Minnesota Correctional Facility ("MCF") Rush City. Defendants moved for summary judgment on all three claims. (*See* Dkt. No. 67.) Mr. Keita filed a response (Dkt. No. 85), Defendants filed a reply (Dkt. No. 87), and Mr., Keita filed a surreply without leave of Court (Dkt. No. 88). Mr. Keita also filed a letter requesting appointment of counsel. (Dkt. No. 89.)

District Judge Jerry W. Blackwell referred the motion to me for a report and recommendation under 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(a). For the following reasons, I recommend the motion be GRANTED.

## I. Governing Standard

Summary judgment is appropriate if the moving party can demonstrate "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). An issue is "genuine" if the record contains enough evidence for a rational trier of fact to find for either party. *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1010 (8th Cir. 2011). And "a fact is material if its resolution affects the outcome of the case." *Id.* If the moving party supports its position with citations to record evidence, the nonmoving party—here, Mr. Keita—must go beyond the pleadings and "set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce of El Dorado, v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999); *see also* Fed. R. Civ. P. 56(c).

At the summary judgment stage, the Court doesn't "weigh the evidence and determine the truth of the matter," but instead considers only "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Kneibert v. Thomson Newspapers, Michigan Inc.*, 129 F.3d 444, 456 (8th Cir. 1997). In doing so, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in his favor. *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995). Nevertheless, if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe

it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. Undisputed Material Facts[1]

This lawsuit stems from two incidents that occurred while Mr. Keita was incarcerated at MCF – Rush City. He sues several Minnesota Department of Corrections ("DOC") employees in their individual capacities: Lieutenant Scott Huckell, Officer Matthew Russell, Officer Jonanthan Peterson, Sergeant Randy Erdman, Lieutenant Jason Oetterer, and Lieutenant Kenneth Peterson. As required by DOC policy, Defendants video recorded the interactions with Mr. Keita that are the subject of this lawsuit. (Moreau Decl. Ex. 7 at DOC 351.) Defendants produced those videos, which are cited below.

### *a. April 16, 2023 Incident*

On April 16, Mr. Keita was housed in the segregation area of MCF – Rush City for disciplinary reasons. (Moreau Decl. Ex. 1 at DOC 256; Huckell Decl. ¶ 6.) Around 9:00pm that evening, an EMT told Defendant Huckell, the watch commander, that Mr. Keita had exposed himself to her while she was

[1] In his briefing, Mr. Keita cites to some exhibits that the Court was unable to locate in the record. The Court does not credit as fact references that do not exist in the record.

waiting for him to take his prescribed medication. (*Id.* Ex. 2; Huckell Decl. ¶ 7.) Mr. Keita denies exposing himself to the EMT. (*See* Dkt. No. 86-1 at 55.)

Because of the EMT's report, Defendant Huckell placed Mr. Keita on Quiet Control Status ("QCS") around 9:37 p.m. (Moreau Decl. Ex. 2; Huckell Decl. ¶¶ 6–7.) Inmates in segregation may be placed on QCS status if they engage in disruptive behavior. (Moreau Decl. Ex. 5 at DOC 364, 372.) During QCS, officers transfer the prisoner to another cell and temporarily confiscate most of the inmate's items, including, in this case, a Qur'an and prayer mat. (*Id.* at 364; Huckell Decl. ¶ 8; Dkt. No. 86-1 at 3.) Those confiscated items are placed in a bin and returned to the prisoner after QCS terminates, usually 24 hours later. (Erdman Decl. ¶ 9; Moreau Decl. Ex. 5 at DOC 372.) QCS policy permits inmates to retain only certain items, including one set of clothes, prescription glasses, footwear, personal hygiene items, a cup, and bedding, including a sheet, pillow, and blanket. (Moreau Decl. Ex. 5 at DOC 372; Erdman Decl. ¶ 9.)

Mr. Keita became upset when officers attempted to place him on QCS, arguing he had not exposed himself to the EMT. (*See* Moreau Decl. Ex. 4 at 00:00–0:46.) After Mr. Keita "became belligerent" and began "refusing directives," a nonparty sergeant activated the Incident Command System ("ICS"), which is used for emergent situations. (Moreau Decl. Ex. 3; Huckell Decl. ¶ 3.) That call triggered activation of the A-Team, "a unit of specialized

staff who are trained to respond to [ICS] calls." (Huckell Decl. ¶ 3.) Defendants Huckell and Erdman are both members of the A-Team who responded to Mr. Ketia's cell after the ICS was activated. (*Id.* ¶¶ 3, 6; Erdman Decl. ¶¶ 3, 6.)

The A-Team arrived at Mr. Keita's cell, informed him about the EMT's report, and told him he'd need to go on QCS. (Moreau Decl. Ex. 4 at 0:00–0:33.) Although he initially refused to move and said officers would need to "get gas" because he would "ride [the situation] out," Mr. Keita ultimately allowed officers to handcuff him through the book slot after several minutes of discussion. (*Id.* at 1:00–1:09, 2:44–8:10; Moreau Decl. Ex. 3.) Although the A-Team had brought a chemical irritant to the cell, they did not deploy it. (Moreau Decl. Ex. 4 at 6:41–8:10; Moreau Decl. Ex. 3.) Mr. Keita was removed from his cell, placed on QCS and patted down. (Moreau Decl. Ex. 4 at 8:11–12:01; Moreau Decl. Ex. 3.) Mr. Keita agreed to comply with an unclothed body search as long as he was moved to a cell in the B-wing. (Moreau Decl. Ex. 3.) After he was moved to a B-wing cell, he complied with that search, and the ICS concluded at 9:52pm. (*Id.*)

About an hour later, officers discovered that Mr. Keita had covered the window of his cell with a blanket. (Huckell Decl. ¶ 10; Moreau Decl. Ex. 8.) The DOC has a policy prohibiting inmates from blocking the window of the cell. (Huckell Decl. ¶ 11–12; Moreau Decl. Ex. 6 at DOC 228.) This policy

exists because covered windows interfere with security rounds, which officers perform every 30 minutes in segregation units to ensure inmate safety. (Huckell Decl. ¶ 11; Erdman Decl. ¶ 12; Oetterer Decl. ¶ 7.) If an officer encounters a covered window, he will order the inmate to remove the obstruction. (Huckell Decl. ¶12.) If the inmate refuses, officers will enact an ICS, and the A-Team will extract the person from the cell. (*Id.*)

After Mr. Keita refused repeated instructions to remove the window covering, Defendant Huckell activated a second ICS around 11:00pm. (*See* Huckell Decl. ¶¶ 10, 13; Moreau Decl. Ex. 8.) By the time the ICS was activated, Mr. Keita had "refused to comply with directives for mechanical restraints," and officers "could not see inside his cell." (Huckell Decl. ¶ 13.) Defendants Erdman, Russell, and J. Peterson—all members of the A-Team—responded to the ICS. (Moreau Decl. Ex. 8 at DOC 71–72, 74, 77.)

After the A-Team arrived at the cell, Mr. Keita initially uncovered the window before covering it back up again and telling officer he would "do[] this every night, all night." (Moreau Decl. Ex. 9 at 0:08 to 0:15; Moreau Decl. Ex. 8 at DOC 72; *see also id.* at 74, 77.) He can also be heard telling staff, "y'all gotta gas me" and instructing them to "get the gas." (Moreau Decl. Ex. 9 at 0:58–1:09; Moreau Decl. Ex. 8 at DOC 71–72.) After Mr. Keita expressly and repeatedly refused to let officers handcuff him through the cell, staff warned him that they would deploy a chemical agent. (Moreau Decl. Ex. 9 at 1:25–

1:38; 1:50–1:65.) Defendant Huckell then ordered staff to release a chemical irritant into the cell using an X-10 device. (Moreau Decl. Ex. 8 at DOC 71–72; Huckell Decl. ¶ 13.) The X-10 device is used to disperse chemical irritants in a targeted area rather than into a crowd or widespread area. (Moreau Decl. Ex. 7 at DOC 347; Moreau Decl. Ex. 25, Ans. to Interrog. No. 2.) The irritant used was the same one that officers carry in handheld devices on their belts. (Huckell Decl. ¶ 14.)

After two nonparty officers deployed the irritant into the cell, Mr. Keita allowed officers to handcuff him through the cell's book slot. (Moreau Decl. Ex. 8 at DOC 72, 74, 80.) An officer asked Mr. Keita whether he'd like "Cool-It," a decontamination spray, but he declined. (Moreau Decl. Ex. 9 at 3:20–3:33; Moreau Decl. Ex. 8 at DOC 71.)

After he was placed in a new cell, Mr. Keita shouted that staff would have to "gas [him] again." (Moreau Decl. Ex. 9 at 4:36–4:47.) Officers cuffed him through the book slot, but Mr. Keita quickly declined to submit to a second unclothed body search, telling officers he'd be "fighting to the last breath," and that he'd be "kicking and scratching and biting." (Moreau Decl. Ex. 10 at 1:03–2:05; Moreau Decl. Ex. 8 at DOC 71–72, 74, 77–78.) An officer asked Mr. Keita to "kneel up on the bed," but he replied, "I'm not kneeling shit." (Moreau Decl. Ex. 10 at 2:23–2:29.) Mr. Keita then physically resisted

the search and tore an officer's radio holster off his belt. (Moreau Decl. Ex. 8 at DOC 71–72, 74, 77–80.)

After observing Mr. Keita's resistance, Defendant Huckell instructed staff to use the WRAP device on him. (Huckell Decl. ¶ 15; Moreau Decl. Ex. 10 at 2:36–2:39.) The WRAP is a tool used to restrain inmates "who refuse[] to walk during escort, become[] passively or actively resistant, become[] assaultive, or demonstrate[] self-injurious behavior." (Moreau Decl. Ex. 7 at DOC 353.) The WRAP is "designed to protect incarcerated persons and staff by reducing the possibility of injury and death." (*Id.* at DOC 349.)

Once officers had moved Mr. Keita into the prone position on the bed in the cell, he once again said, "I'm biting, I'm kicking, I'm scratching, all that shit." (Moreau Decl. Ex. 10 at 2:52–2:56.) Five officers in the cell proceeded to disrobe Mr. Keita, who complained about officers bending his wrist. (*Id.* at 3:33–5:25.)

Mr. Keita refused to help officers move him to the floor, so they picked him up and placed him on the floor of the cell in the prone position. (Moreau Decl. Ex. 10 at 5:26–5:38.) He complained about wrist pain while officers handcuffed him, but Mr. Keita was visibly squirming and resisting at the same time, and he continued yelling at officers. (*Id.* at 5:38–6:06.) Mr. Keita yelled at officers to "get their hands off [his] spine" while he continued to squirm. (*Id.* at 6:32–6:46.) Mr. Keita continued to loudly yell about pain in

his ankles and wrists as officers worked to place him in the WRAP. (*Id.* at 8:00–8:46.) A few minutes into the process, Mr. Keita said: "I wish I had a gun. I'd shoot every single one of you motherfuckers in the head." (*Id.* at 9:06–9:09.)

Officers eventually rolled Mr. Keita into a sitting position, with his bound legs facing straight out from his body. (Moreau Decl. Ex. 10 at 9:55–10:05.) After one officer instructed, "keep his head down," Mr. Keita bit Defendant Russell's forearm hard enough to tear off flesh. (*Id.* at 10:14–10:21; Moreau Decl. Ex. 20 at DOC 38.) Mr. Ketia bit harder when Defendant Russell tried to pull his arm away; Mr. Russell then punched Mr. Keita, aiming for his jaw. (Moreau Decl. Ex. 8 at DOC 72, 74, 79, 80; Moreau Decl. Ex. 10 at 10:14–10:21.) After Mr. Keita let go of Defendant Russell's arm, a nonparty sergeant ordered Defendant Russell to leave the cell, which he did. (Moreau Decl. Ex. 8 at DOC 75; Moreau Decl. Ex. 10 at 10:21–10:41.) Mr. Keita later pled guilty to fourth-degree assault in Chisago County court for biting Defendant Russell. (Moreau Decl. Exs. 18–19, 20 at DOC 33, 36.)

Around the same time, Mr. Keita started yelling "you're on my spine," and telling officers to "get off of [him]," although he was still in a sitting position at this time. (Moreau Decl. Ex. 10 at 10:29–11:01.) Mr. Keita also instructed Defendant J. Erdman to "get [his] arm away from [Mr. Keita]." (*Id.* at 11:04–11:07.) Mr. Keita continued to yell about the knee on his back.

(*Id.* at 11:13–11:41.) He again warned Defendant Erdman to keep his hand off his back. (*Id.* at 12:35–12:43.) Officers then picked Mr. Keita up by the WRAP, rotated him, and placed him in a cart to wheel him out of the cell. (*Id.* at 13:07–14:20.)

On August 4, 2023, Defendant Erdman sent a note to Mr. Keita about the April 16 incident that read, in part: "I think we all learned from that incident and we can all forgive one another. That is how we will get through life. Learn from our mistakes and take responsibility for our actions." (Dkt. No. 86-1 at 58.)

***b. April 19, 2023 Incident***

Three days later, another ICS was activated for Mr. Keita around 8:00am after he refused directives. (Moreau Decl. Ex. 13.) Later that same evening, another ICS was activated because Mr. Keita was again "covering his windows and refusing directives." (Moreau Decl. Ex. 14 at DOC 145.) At some point on April 19, Mr. Keita was placed back on QCS status for refusing directives. (*See* Moreau Decl. Ex. 13.) Mr. Ketia informed a nonparty officer that "he would not uncover his window until he got shoes, socks, and multiple other items." (Moreau Decl. Ex. 14 at DOC 147.)

After Mr. Keita refused multiple directives to remove the window covering—including a final request made after the A-Team donned protective gear—officers used the X-10 device to introduce the chemical irritant into Mr.

Keita's cell via the book pass. (Moreau Decl. Ex. 14 at DOC 145, 147, Ex. 15 at 00:01–00:17.) Defendant Oetterer closed the book pass after the X-10 was removed, but he "noticed the tip of a finger near the center of the book pass . . . a split second before it was secured." (Moreau Decl. Ex. 14 at DOC 145, Ex. 15 at 00:19–00:22.) Mr. Keita immediately and repeatedly yelled that the action had broken his finger. (Moreau Decl. Ex. 14 at DOC 147, Ex. 15 at 00:20–00:25.) Defendant Oetterer's declaration states that he "did not see [Mr. Keita's] finger in the book pass before closing" it. (Oetterer Decl. ¶ 11.)

Shortly after the injury to his finger, Mr. Keita allowed himself to be cuffed up through the slot, and officers removed him from the cell. (Moreau Decl. Ex. 15 at 1:00–1:35.) Officers moved him to a new cell, where Mr. Ketia complained that they "broke [his] finger." (*Id.* at 1:43–2:00.) Officers began placing Mr. Keita in the WRAP while his finger bled. (*Id.* at 2:00–2:54.) A few minutes later, an officer asked Mr. Keita if he wanted Cool-It, to which Keita replied, "I don't need your mercy . . . you can suck my dick." (*Id.* at 5:59–6:14.)

After Mr. Keita was placed in the WRAP, he spit on Defendant Oetterer's face shield. (Moreau Decl. Ex. 14 at DOC 145; Moreau Decl. Ex. 15 at 9:09–9:20.) Around this same time—about nine minutes after Mr. Keita's injury—a nurse arrived to assess his finger. (Moreau Decl. Ex. 15 at 10:09–10:33, Moreau Decl. Ex. 14 at DOC 145, 149, 159.) Mr. Keita repeatedly told

the nurse not to touch him, and that he "would rather let [his] finger die off [his] hand." (Moreau Decl. Ex. 15 at 11:39–11:54.) A subsequent x-ray of his finger was "mostly negative" with a possibility of "some crush bony injury to distal phalanx." (Dkt. No. 1-1 at 40; *see also* Moreau Decl. Ex. 16.) Medical records indicate Mr. Keita had an injury to "bony and skin/nail [t]issue" with "no apparent tendon or joint involvement." (Dkt. No. 1-1 at 40.)

***c. Disciplinary Proceedings***

Defendant K. Peterson is responsible for reviewing incidents in the prison and deciding whether to issue a charge. (K. Peterson Decl. ¶¶ 2–3.) If he decides that a charge is warranted based on an inmate's behavior, he drafts a notice of violation summarizing the events, witnesses, and evidence. (*Id.* ¶ 4.) He may also offer a waiver—which requires preapproval from the assistant warden of administration ("AWA")—that offers leniency in punishment in exchange for an admission to the charged conduct and a waiver of the due process hearing. (*Id.* ¶ 5.)

Defendant K. Peterson reviewed the April 16 and April 19 incidents and issued two notices of violation to Mr. Keita for each event (NOV #1028038 and NOV #1028244, respectively). (K. Peterson Decl. ¶¶ 7, 9.) Each NOV charged Mr. Keita with seven separate rule violations. (*Id.*)

Mr. Keita signed the waiver form for the April 16 incident. (K. Peterson Decl. ¶ 11; Dkt. No. 86-1 at 38.) Under that charge, he could have

received 30–360 days in segregation, plus an additional 240–720 days of incarceration. (K. Peterson Decl. ¶ 8.) Defendant K. Peterson offered a waiver under which Mr. Keita would accept 270 days in segregation plus an extra 90 days of incarceration in exchange for admitting the violation and waiving his due process hearing. (*Id.*) The AWA, the warden, and the deputy commissioner had approved this waiver before Defendant K. Peterson offered it to Mr. Keita. (*Id.*) Sometime before July 7, Mr. Keita accepted this offer by signing it. (*Id.* ¶ 11.) Although Defendant K. Peterson and another sergeant watched Mr. Keita sign, Mr. Keita kept the document. (*Id.*)

On May 4, 2023, Mr. Keita was transferred from MCF – Rush City to MCF – Oak Park Heights. (Moreau Decl. Ex. 1 at DOC 256.)

On July 7, 2023, a hearing for the April 19 violation, the only remaining charge, was held via Teams. (K. Peterson Decl. ¶ 9.) Mr. Keita appeared with a staff representative before a hearing officer, who acted as a neutral magistrate. (*Id.* ¶ 10.) Defendant K. Peterson presented evidence at the hearing to prove the charges against Mr. Keita. (*Id.*) During the hearing—which was limited to the charge stemming from the April 19 incident—Mr. Keita attempted to raise arguments related to the April 16 charge, even though he had already signed a waiver for the earlier incident. (*Id.* ¶ 12.) The hearing officer told Mr. Keita that the proceedings were limited to the April 19 violation because he'd signed a waiver related to the

April 16 charge. (*Id.*) Mr. Keita then "tore up the waiver form" and "ate most of it." (*Id.* ¶ 13.) The hearing officer imposed 90 days of segregation and 70 days of extended incarceration with respect to the April 19 charge. (*Id.* ¶ 15.) The disciplinary segregation was ordered to run concurrently with the 270 days imposed in connection with the April 16 violation, and the extended incarceration time ran consecutively. (*Id.*)

On October 1, 2023, Mr. Keita submitted a kite—a written request to staff by an inmate—while housed in the administrative control unit at MCF – Oak Park Heights. (*See* Dkt. No. 1-1 at 44.) He complained about, among other things, "dried bodily fluids, dried blood . . . , and bugs" in the recreation rooms, as well as "spiders, ants, and gnats in [his] cell." (*Id.*; *see also* Dkt. No. 86-1 at 42–47, 67–70.) He filed this lawsuit a few months later.

## III. <u>Analysis</u>

Mr. Keita seeks relief pursuant to 42 U.S.C. § 1983. He claims Defendants Huckell, J. Peterson, Russell, Erdman, and Oetterer violated his constitutional rights under the First, Eighth, and Fourteenth Amendments to the Constitution. (Compl. (Dkt. No. 1) at 9.) He also claims Defendant K. Peterson violated his rights under the Eighth and Fourteenth Amendments. Defendants seek summary judgment on all of Mr. Keita's claims.

***a. First Amendment - Free Exercise***

Defendants move for summary judgment on Mr. Keita's claim that Defendants Huckell, J. Peterson, Russell, Erdman, and Oetterer violated his First Amendment rights by confiscating his Qur'an and prayer mat. Defendants first argue that the confiscation of Mr. Keita's religious items does not rise to the level of a substantial burden on his ability to practice his religion. Second, Defendants assert that Mr. Keita can't succeed on a free exercise claim based on individual officers' implementation of a policy that has itself not been challenged. Finally, Mr. Keita's complaints related to his Ramadan meals are insufficient to establish a First Amendment claim.

The First Amendment—made applicable to the states through the Fourteenth Amendment—prevents the government from passing laws and regulations or adopting policies that "prohibit[] the free exercise" of religion. U.S. Const. amend. 1. "[W]hen a prison regulation or policy impinges on an inmate's sincerely held religious beliefs, the regulation is valid if it is reasonably related to legitimate penological interests." *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1053 (8th Cir. 2020) (quotation omitted). Before the Court engages in this balancing test, however, the inmate must first show that "the challenged regulation 'substantially burdens' his sincerely held

belief." *Id.* (quoting *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).

*i.* *The Record Does Not Support a Substantial Burden*

A regulation imposes a substantial burden when it (1) "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a person's individual religious beliefs," (2) "meaningfully curtail[s] a person's ability to express adherence to his or her faith, or" (3) "den[ies] a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Mbonyunkiza*, 956 F.3d at 1053 (quoting *Patel*, 515 F.3d at 813).

Mr. Keita hasn't proffered any evidence to suggest that the named Defendants were responsible for placing him on QCS status on April 19. The relevant question, therefore, is whether Mr. Keita's rights were substantially burdened when he was placed on QCS status on April 16. Because they were not, Defendants are entitled to summary judgment on Mr. Keita's First Amendment claim.

There's no dispute that DOC policy does not provide for religious items while on QCS. It is undisputed that Mr. Keita did not have access to his Qur'an or prayer mat during the time he was on QCS, nor is there any dispute that these events took place during the final week of the month of Ramadan. It's not precisely clear from the record how long Mr. Keita spent

on QCS status in the relevant time frame. He was placed on QCS status around 9:37 p.m. on April 16 and was removed from QCS status sometime on or before April 19, when he was placed back on QCS status. At most, then, Mr. Keita spent roughly 72 hours without his prayer mat and Qur'an.[2] But "[d]e minimis impositions on a person's ability to practice his . . . religion do not constitute the type of violation with which the Constitution is concerned." *Hari v. Stuart*, 19-CV-1330 (ECT/TNL), 2020 WL 7249816, at *5 (D. Minn. Aug. 21, 2020) (citing cases), *report and recommendation adopted,* 19-CV-1330 (ECT/TNL), 2020 WL 6391305 (D. Minn. Nov. 2, 2020); *cf. McCroy v. Douglas Cnty. Corr. Ctr.*, 394 F. App'x. 325, 326 (8th Cir. 2010) ("[N]either the initial confiscation of McCroy's [prayer mat and Qur'an], nor the two-week delay in returning them to him, rose to the level of a constitutional violation.").

Further, Mr. Keita hasn't proffered any evidence suggesting he "exhausted alternative means of accommodating his religious [] need." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008). He has not, for example, argued or presented evidence suggesting that he was unable to pray or observe Ramadan without his prayer mat and Qur'an. In response, he

[2] Mr. Keita neither alleges nor presents evidence that Defendants withheld these items beyond the time he spent on QCS. In fact, he seems to concede the conditions only lasted between April 16 and 19. (*See* Resp. at 3.)

claims that "following the Qur'an requires ritual practice, especially during the last ten nights of Ramadan," but he doesn't elaborate on this statement or provide any evidence that he was restricted in his practice. (Resp. (Dkt. No. 85) at 5.)

Mr. Keita points to Defendant Erdman's admission that he and a nonparty officer "told [Mr. Keita] [they] would go speak with Lt. Huckell to see if he can authorize the religious items for the plaintiff." (Dkt. No. 86-1 at 3; *see also* Resp. at 4.) At best, this argument criticizes Defendant Erdman's efforts to obtain items not authorized by the QCS policy and Defendant Huckell's refusal to provide them. Mr. Keita's demand for these items and Defendant Huckell's refusal does not establish a substantial burden on Mr. Keita's practice.

Mr. Keita hasn't presented sufficient evidence for a reasonable factfinder to conclude that his right to exercise his religion was substantially burdened. Because the required threshold showing of substantial burden on religious practice is unsupported in the record, I do not reach Defendants' second argument on the First Amendment claim (i.e., that Mr. Keita failed to challenge the underlying QCS policy).

### *ii. <u>Mr. Keita's Allegations Related to Ramadan Meals Are Not First Amendment Violations</u>*

Next, it's not clear whether Mr. Keita is raising a free exercise claim related to the denial of meals during Ramadan. (*See* Compl. at 4 (asserting Mr. Keita did not receive "his Ramadan dinner meal . . . many times during that month of Ramadan").) In his Response, Mr. Keita asserts, without citation, that he "went thirteen hours without food and water" on the evening of April 16, but concedes "he was given his Ramadan Meal" after making several verbal complaints. (Resp. at 2.) Mr. Keita has not proffered any evidence regarding this alleged denial of a Ramadan meal. In any event, "a short-term and sporadic disruption of [a prisoner's] Ramadan eating habits does not . . . allege a substantial burden on his religious freedom." *Winston v. Edwards*, 4:20-cv-566 NCC, 2020 WL 7316116, at *8 (E.D. Mo. Dec. 11, 2020) (second alteration in original) (quoting *Maynard v. Hale*, 2012 WL 3401095, at *1 (M.D. Tenn. Aug. 14, 2012)).

Finally, Mr. Keita claims that because he complained about his Ramadan meals, Defendants Erdman and Huckell "falsely accus[ed] [Mr. Keita] of acting inappropriately towards" the EMT. (Resp. at 2.) And that retaliatory accusation, he claims, led to the deprivation of his prayer mat and Qur'an. There's no dispute that the EMT's report exists. But the veracity of the underlying report—i.e., whether Mr. Keita in fact exposed himself to the

EMT—is not material to the claims raised against Defendants Erdman and Huckell.[3] The record evidence demonstrates that Defendants Erdman and Huckell believed and relied on the EMT's report. And their subsequent actions of placing Mr. Keita on QCS status flowed from that reasonable belief in the EMT's report.

Mr. Keita hasn't come forth with any evidence from which a reasonable factfinder could conclude that Defendants Erdman and Huckell either pressured the EMT to make a report or fabricated the report on her behalf. For their disciplinary actions to be retaliatory, Defendants Erdman and Huckell would have to at least known that the EMT's report was false. And there is no record evidence to support such knowledge. *See De Rossitte v. Correct Care Sols., LLC*, 22 F.4th 796, 804 (8th Cir. 2022) (affirming summary judgment in favor of prison where prisoner alleging First Amendment retaliation "cite[d] no evidence, either direct or indirect, linking any adverse action to the filing of his prison grievances" and concluding prisoner's "mere allegations of retaliatory motive [we]re insufficient").

[3] Mr. Keita also relies on a response to a kite that nonparty Sergeant Binger sent to him. (Dkt. No. 86-1 at 55.) Sergeant Binger's response states that he did not see Mr. Keita expose himself to the EMT, nor did the EMT tell Sergeant Binger that such an incident occurred. (*Id.*) But that kite was sent nearly a full month after the incident. (*See id.*) There's no evidence that Defendant Huckell or Erdman spoke to Sergeant Binger at the time they placed Mr. Keita on QCS status, nor is it clear that Sergeant Binger's statements would affect the constitutional analysis.

Because there are no genuine disputes of material fact on any theory of Mr. Keita's First Amendment claim, I recommend the Court grant summary judgment in Defendants' favor.

***b. Eighth Amendment***

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. XIII. But "[n]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000). "The infliction of pain in the course of a prison security measure [] does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Instead, an officer's use of force only violates the Eighth Amendment if "the measure taken inflicted unnecessary and wanton pain and suffering"—a question that "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quotation omitted). Factors relevant to this inquiry include "the objective need for force; the relationship between the need for force and the force used; the threat to others reasonably perceived by the officers; efforts to temper the severity of the force used; and the extent of pain or injury inflicted." *Hickey*

*v. Reeder*, 12 F.3d 754, 758 (8th Cir. 1993); *see also Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017).

To succeed on his Eighth Amendment claim, Mr. Keita must proffer evidence from which a reasonable factfinder could conclude Defendants acted both maliciously and sadistically. *See Howard v. Barnett*, 21 F.3d 868, 872 (8th Cir. 1994) (noting those "two [words] together establish a higher level of intent than would either alone"). An officer acts maliciously when he "undertak[es], without just cause or reason, a course of action intended to injure another." *Id.* An officer acts sadistically when he "engag[es] in extreme or excessive cruelty or [] delight[s] in cruelty." *Id.* This "highly deferential" standard recognizes that "'[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Jackson*, 866 F.3d at 974 (quoting *Hudson*, 503 U.S. at 6). It does not, however, "insulate actions taken in bad faith or actions that amount to a wanton infliction of pain for no legitimate reason." *Hickey*, 12 F.3d at 758.

In sum, Mr. Keita's "case should not go to the jury" if his proffered evidence demonstrates nothing more than "a mere dispute over the reasonableness of a particular use of force or the existence of arguably

superior alternatives." *Jackson*, 866 F.3d at 975 (quoting *Whitley*, 475 U.S. at 322).

*i.* *April 16 Incident*

First, Mr. Keita claims that Defendants Huckell, Russell, Jonathan Peterson, and Erdman violated his Eighth Amendment rights on April 16 by using excessive force or failing to intervene.

He contends Defendants Russell, Erdman and J. Peterson "gas[sed] him with a crowd control chemical irritant," that also affected "everyone else within the vicinity." (Resp. at 3.) But Defendants have proffered evidence that the X-10 is not a crowd control device, and the chemical used is the same as the one contained in the officers' handheld devices. Mr. Keita has not presented any evidence to the contrary. There is no evidence that other inmates were affected by the gas, nor would that be material to Mr. Keita's claim that officers violated *his* Eighth Amendment rights.

Nor could any reasonable jury conclude that officers violated Mr. Keita's constitutional rights by deploying the X-10 under the circumstances. There is no dispute that Mr. Keita refused to uncover his window, nor is there a dispute that covering the windows was against prison safety policy.[4]

[4] Mr. Keita claims he only covered his window in protest because he did not have access to his religious materials. (Resp. at 5.) But his motivation for covering his window in violation of policy is immaterial. Similarly, Mr. Keita's contention that other prisoners covered their windows is both unsupported by evidence and

There is no dispute that officers warned Mr. Keita several times that they would spray the irritant into his cell as a result. There is no dispute that Mr. Keita still refused to comply, and even told officers they would have to "get the gas." Finally, there is no dispute that Mr. Keita was offered but ultimately refused Cool-It shortly after he was extracted from the cell. Considering the deference owed to prison officials, there is no reasonable factfinder who could conclude that officers acted maliciously or sadistically in administering the chemical irritant into Mr. Keita's cell under these circumstances. *Cf. Ward v. Smith*, 844 F.3d 717, 722 (8th Cir. 2016) (finding no constitutional violation where officer "administered pepper spray only after [prisoner] refused the direct orders to submit to wrist restraints and the use of force was necessary to gain [prisoner's] compliance and maintain the safety and security of [the prison]").

Next, Mr. Keita argues he "was punched, dragged across the floor while completely naked, kneeled on, chocked [sic]" and that his limbs were "twisted . . . to abnormal degrees," before he was placed in the WRAP. (Resp. at 3.) But the evidence in the record would not permit a reasonable factfinder to conclude that these officers violated Mr. Ketia's rights during the course of him being placed in the WRAP. The video evidence shows these Defendants

---

immaterial to the question of whether officers violated Mr. Keita's constitutional rights. (*Id.*)

were measured and in control throughout the process. (*See, e.g.*, Moreau Decl. Ex. 10 at 2:23–13:30.) Mr. Keita claims Defendant J. Peterson choked him and kneeled on his spine while officers were putting him in the WRAP. There is no dispute that Defendant J. Peterson's elbow made contact with Mr. Keita during this process. Nor is there a dispute that Defendant Erdman told Defendant J. Peterson to move his arm, although there is conflicting argument about the reason why Defendant Erdman gave that directive. But after careful review of the evidence in the record—particularly the video footage—I conclude that no reasonable jury could find that Defendant J. Peterson acted with the requisite malicious and sadistic intent.

Mr. Keita repeatedly informed officers of his intent to not comply and, indeed, he squirmed, yelled, and swore throughout the interaction. He complained about the named Defendants placing their hands on his spine while he was lying in the prone position on the floor, but it is unclear how officers could place a prone, struggling inmate in the WRAP without putting their hands on his back. There is nothing in the video—either in the officer's actions or Mr. Keita's reaction—that would permit a jury to conclude that this contact with Mr. Keita's back rose to the level of cruel and unusual punishment. *See Walker v. Meadows*, 4:24-cv-0036-JJV, 2025 WL 21026, at *4 (E.D. Ark. Jan. 2, 2025) ("It is well settled that prison officials do not

violate the Eighth Amendment when using a limited amount of force to regain control of a recalcitrant inmate." (citing cases)).

After Mr. Keita was moved into the sitting position, he bit Defendant Russell hard enough to remove flesh from the officer's arm. Shortly after that, he complained about staff members placing their knees on his spine and their arms near his neck. Mr. Keita was sitting up with his legs out in front of him at that time, as opposed to lying in the prone position. No evidence in the record supports Mr. Keita's conclusory statement that this contact interfered with his ability to breathe. The video shows Mr. Keita keeping up a steady stream of complaints, insults, and threats, demonstrating that he could breathe. Even assuming the officers involved could have handled the situation in a more reasonable manner, that is not the pertinent question. In light of the circumstances presented—namely Mr. Keita's persistent and escalating resistance—no reasonable factfinder could conclude officers acted maliciously and sadistically. To the contrary, the video evidence shows the officers maintaining a remarkably patient demeanor despite Mr. Ketia's behavior.

Similarly, Mr. Keita also points to the note that Defendant Erdman sent after the incident. But even if the letter could be read as an admission that Defendant Erdman made a mistake on April 16, that's not enough to sustain a claim for relief under the Eighth Amendment. *See Hickey*, 12 F.3d

at 758 (recognizing evidence of "mere inadvertence or good faith mistakes as to the amount of force reasonably called for" can't sustain a cruel and unusual punishment claim).

Finally, Mr. Keita argues that Defendant Russell violated his Eighth Amendment rights by punching him during the struggle on the floor. Although the video doesn't show Mr. Keita's teeth sinking into Defendant Russell's arm, it's clear from the video that Defendant Russell punched Defendant Keita as a reaction to being bitten. "[S]ummary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy." *Hickey*, 12 F.3d at 759. Defendant Russell's reaction was instantaneous and was over quickly, and he left the cell almost immediately after he freed himself from Mr. Keita. And Mr. Keita later pleaded guilty to assault, undermining his unsupported statement that he acted in self-defense.

Under the circumstances presented here, no reasonable jury could conclude that any of the named Defendants' actions on April 16 constituted cruel and unusual punishment. *Cf. Job v. Hagen,* 8:04-cv-451, 2007 WL 316280, at *6 (D. Neb. Jan. 30, 2007) (granting summary judgment where nothing in the record suggested officers "exceeded the degree of force they

perceived necessary to subdue the plaintiff in the circumstances of an unprovoked assault on a corrections officer").

*ii.* *April 19 Incident*

Second, Mr. Keita claims Defendant Oetterer violated his Eighth Amendment rights on April 19 by spraying gas in his cell, slamming his finger in the book slot of the cell door, and placing him in the WRAP without providing medical attention. There's no dispute that gas was sprayed into Mr. Ketia's cell, that his finger was injured after it was shut into the book slot, or that Mr. Keita was placed into the WRAP. But there's nothing in the record, other than Mr. Keita's unsupported statements, that would permit a reasonable factfinder to conclude that Defendant Oetterer's actions were malicious or sadistic.

Instead, Mr. Keita's cell was sprayed with chemical irritant after he again refused to remove his window covering. Officers provided a final warning before they administered the irritant to coerce his compliance. He was immediately removed from the cell and quickly offered a decontaminant, which he declined. None of Defendant Oetterer's decisions with respect to the chemical irritant rise to the level of a constitutional injury. *See Jones*, 207 F.3d at 496 (concluding that "a limited application of [chemical irritant] to control a recalcitrant inmate constitutes a tempered response by prison officials when compared to other forms of force," and cautioning that the

spray's use "in such manner and purpose . . . should rarely be a proper basis for judicial oversight" (citations and quotations omitted)).

Nor could a reasonable factfinder conclude that Defendant Oetterer intended to maliciously and sadistically slam the book slot on Mr. Keita's finger. The removal of the X-10, the insertion of Mr. Keita's finger, and the closing of the book slot happened within a single second. (*See* Moreau Decl. Ex. 15 at 0:19–0:20.) Even if it would have been more reasonable for Mr. Oetterer to make sure the book slot was clear before shutting the tray, that is not the relevant question. Based on the video evidence, no reasonable factfinder could conclude that Mr. Oetterer had the requisite intent to harm Mr. Keita under these circumstances.

Finally, nothing about the remainder of the interaction supports Mr. Keita's Eighth Amendment claim against Defendant Oetterer. The decision to place Mr. Keita in the WRAP prior to calling for medical attention was not malicious or sadistic. On the contrary, officers secured Mr. Keita and brought the nurse to his cell within nine minutes of his injury. No reasonable factfinder could conclude that this short delay in treating Mr. Keita's finger injury constituted cruel and unusual punishment. Accordingly, Defendant

Oetterer is entitled to summary judgment on Mr. Keita's Eighth Amendment claim.

*iii.* *Conditions of Confinement*

Mr. Keita also challenges the conditions of confinement in the administrative control unit. (*See* Compl. at 7 (listing, insects, bodily fluid, lack of clean laundry, condition of mattress, and artificial lighting as issues).) But Mr. Keita concedes the alleged issues existed at MCF – Oak Park, not MCF – Rush City. (*See* Resp. at 9.) Mr. Keita has not proffered any evidence from which a rational factfinder could conclude that the named defendants from MCF – Rush City are responsible for the alleged conditions. Accordingly, this claim fails as a matter of law, and Defendants are entitled to summary judgment. *See Ihekoronye v. City of Northfield, Minn.*, 07-CV-1642 JMR/FLN, 2008 WL 906206, at *5 (D. Minn. Mar. 31, 2008) ("Absent specific facts of personal involvement in, or direct responsibility for the actual constitutional deprivations of which he complains, plaintiff is unable to show these defendants violated his constitutional rights." (quotation omitted)).

***c. Fourteenth Amendment***

Finally, Defendants move for summary judgment on Mr. Keita's Fourteenth Amendment claim, arguing (1) his disciplinary segregation doesn't implicate a protected interest; (2) a challenge to the extended incarceration is barred by *Heck*. Because they are correct on both counts, I

recommend the Court enter summary judgment in Defendants' favor on this claim.

*i. Disciplinary Segregation*

Under the Fourteenth Amendment, a state cannot deprive "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The due process analysis has two components. First, the Court considers whether the state deprived the plaintiff of a protected life, liberty, or property interest. *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). In the prison context, a protected interest is only implicated "when the punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Jackson v. Schnell*, 24-CV-3334 (NEB/LIB), 2024 WL 5710170, at *6 (D. Minn. Oct. 15, 2024) (quoting *Sandin v. Connor*, 515 U.S. 472, 484 (1995)), *report and recommendation adopted*, 2025 WL 1355271 (D. Minn. May 9, 2025). "Loss of privileges and temporary placement in more restrictive housing fall short of this standard." *Id.* (citing *Kennedy v. Blankenship*, 100 F.3d 640, 642–43 & n.2 (8th Cir. 1996)); *see also Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship.").

Here, Mr. Keita's placement in disciplinary segregation doesn't implicate a protected liberty interest. The fact that he received an additional

270 days in segregation, without more, is not sufficient to establish an atypical or significant hardship on Mr. Keita in relation to the ordinary incidents of prison life. *Cf. Hemphill v. Delo*, 124 F.3d 208 (8th Cir. 1997) (unpublished) (per curiam) (reaching same conclusion where inmate "spent four days locked in his housing unit, thirty days in disciplinary segregation, and approximately 290 days in administrative segregation").

To be sure, Mr. Keita sent a kite complaining about bugs and bodily fluids about in the administrative control unit at MCF – Oak Park. Even assuming those conditions would constitute an atypical and significant hardship,[5] all named Defendants work at MCF – Rush City, not MCF – Oak Park. Mr. Keita hasn't proffered any evidence to suggest that they would be responsible for the conditions at MCF – Oak Park Heights. Defendants are therefore entitled to summary judgment on this portion of Mr. Keita's claim.

*ii. <u>Extended Incarceration</u>*

Defendants appear to concede that Mr. Keita has a protected interest in his extended incarceration, so I move to the second step of the due-process analysis. If a protected right is in play, the Court then considers whether the

[5] This is a dubious assumption. *Cf. Sanchez v. Walker*, 09-cv-2289, 2010 WL 5313815, at *6 (N.D. Ill. Dec. 17, 2010) (finding no atypical or significant hardship where inmate in segregation complained of cockroaches, mice, and "brownish [toilet] buildup" that was "hard like a rock" and "smelled like urine" (cleaned up)). And, in any event, Mr. Keita does not point to any evidence in the record supporting the existence of the alleged poor conditions. (*See* Resp. at 9–10.)

plaintiff received sufficient process before depriving him of that right. *Goff v. Dailey*, 991 F.2d 1437, 1440 (8th Cir. 1993) (citing *Wolff v. McDonnell,* 418 U.S. 539, 555–58 (1974)). "Although prisoners are entitled to constitutional protections, '[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply.'" *Shannon v. Fabian*, 09-cv-3422 (MJD/AJB), 2010 WL 1960181, at *4 (D. Minn. Mar. 8, 2010) (quoting *Wolff,* 418 U.S. at 556), *report and recommendation adopted,* 09-3422 (MJD/AJB), 2010 WL 1960148 (D. Minn. May 17, 2010).

Further, "a section 1983 action should be dismissed if a judgment 'would necessarily imply the invalidity of [a plaintiff's] conviction or sentence,' unless the conviction or sentence was reversed, expunged, declared invalid, or called into question." *Moore v. Sims*, 200 F.3d 1170, 1171 (8th Cir. 2000) (quoting *Heck*, 512 U.S. at 487). If an inmate's "success on the merits of a particular § 1983 claim would necessarily imply the invalidity of a disciplinary result lengthening [his] prison sentence," *Heck* bars the claim unless there has been "a favorable termination of the action in an authorized state tribunal or a federal habeas court, even if the [§ 1983] claim is for

damages rather than earlier release." *Sheldon v. Hundley*, 83 F.3d 231, 233 (8th Cir. 1996).

Defendants are entitled to summary judgment on the portion of Mr. Keita's due process claim challenging his extended incarceration. That challenge is barred by *Heck* because Mr. Keita hasn't demonstrated the extended incarceration imposed by the disciplinary hearing officer has been vacated by a state or federal court.

Mr. Keita also argues that his due process rights were violated because he didn't receive a hearing for the April 16 violation. But Defendants have come forth with evidence that Mr. Keita accepted the waiver and signed the form, even though he later ate most of it. Beyond his conclusory denial, Mr. Keita has not come forth with evidence to create a genuine issue of fact on this point. Because he waived his right to a hearing, there is no constitutional violation.

In his response, Mr. Keita also seems to argue that he was denied the chance to call witnesses for the hearing regarding the April 19 charge. (*See* Resp. at 10 (citing "NOV number 1028244[]).) Assuming that claim was included in his complaint, nothing on the hearing recording supports that

assertion. (*See* Moreau Decl. at Ex. 24.) Nor did Mr. Keita name the hearing officer responsible for those types of decisions as a defendant in this case.

Because Mr. Keita hasn't proffered sufficient evidence to demonstrate that the named Defendants violated his Fourteenth Amendment rights, I recommend the Court grant Defendants' motion.

## IV. Request for Counsel

Finally, Mr. Keita sent a letter to the Court asking it to "assign an attorney to this case" because there "are issues in this case that warrant a jury trial." (Dkt. No. 89 at 1–2.) Because there are no triable issues remaining, this request should be denied as moot.

## V. Recommendation

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT Defendants' motion for summary judgment (Dkt. No. 67) be GRANTED and judgment be entered against Mr. Keita.

Dated: July 31, 2026

*s/Elsa M. Bullard*
Elsa M. Bullard
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).